UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

    v.

DUSTIN COFFELT,                                          23-CR-55-LJV-MJR
                                                           DECISION & ORDER
          Defendant.
_____

The defendant, Dustin Coffelt, was charged in a three-count indictment with producing child pornography (counts 1 and 2) and possessing child pornography (count 3). Docket Item 26. The case was assigned to this Court, and on May 17, 2023, this Court referred the case to United States Magistrate Judge Michael J. Roemer for all purposes under 28 U.S.C. §§ 636(b)(1)(A) and (B). Docket Item 28.

On August 7, 2023, Coffelt moved to suppress statements that he made to law enforcement in July and August of 2022. Docket Item 38. After receiving a response from the government, Docket Item 40, and conducting an evidentiary hearing, *see* Docket Item 56, Judge Roemer issued a report and recommendation ("R&R") finding that Coffelt's motion should be denied, Docket Item 73.

Coffelt objected to the R&R, Docket Item 76; the government responded, Docket Item 78; and Coffelt replied, Docket Item 79. This Court then heard oral argument[1] and

---

[1] Prior to oral argument before this Court, Coffelt's attorney identified a conflict, requiring the appointment of new counsel. *See* Docket Item 82. New counsel then was given additional time to review the file, meet with Coffelt, and prepare for argument. *See* Docket Items 83 and 88.

ordered supplemental briefing, see Docket Item 90, which the parties provided on December 3, 2025, Docket Items 92 and 93.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). The court must review de novo those portions of a magistrate's recommendations to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the objection, response, and reply; the materials submitted to Judge Roemer; and the supplemental briefing submitted to this Court. Based on that de novo review and for the reasons that follow, this Court accepts and adopts the R&R and denies Coffelt's motion to suppress.

## DISCUSSION

The facts outlined below are drawn from Judge Roemer's findings of fact, see Docket Item 73 at 2-7,[2] as well as this Court's independent review of the audio recording of the July 2022 interview, Gov. Ex. 2 (from the evidentiary hearing), and the video recording of the August 2022 interview, Docket Item 38, Ex. B.[3] Generally, a district court must accept a magistrate judge's findings of fact unless they are clearly erroneous, see United States v. Pereyra, 2010 WL 2696990, at *1 (E.D.N.Y. July 2, 2010), aff'd, 425 F. App'x 56 (2d Cir. 2011), and this Court finds nothing erroneous with Judge Roemer's findings. That being said, because the legal issues Coffelt raises

---

[2] Page numbers in docket citations refer to ECF pagination.

[3] The Court assumes the reader's general familiarity with the factual background and will refer only to those facts necessary to explain its decision.

2

involve mixed questions of law and fact, the Court has reviewed Judge Roemer's findings de novo. *See Duca v. United States*, 1995 WL 428636, at *5 (E.D.N.Y. July 7, 1995) ("[M]ixed determinations of law and fact[] must be reviewed de novo." (citation and italics omitted)), *aff'd sub nom. Lo Duca v. United States*, 93 F.3d 1100 (2d Cir. 1996).

I.   **JULY INTERVIEW AT COFFELT'S HOME**

On July 29, 2022, Coffelt spoke with two detectives during a "knock and talk" interview at his home. *See* Docket Item 73 at 3. After the officers arrived at Coffelt's door, they asked Coffelt whether he would speak with them. *See id.* He said "sure" and gestured for them to come in. *See id*. ay 3-4.

Coffelt sat on the couch in the living room. *See id.* at 4. One officer sat on the opposite side of the couch, and the other officer sat in a rocking chair. *See id.* One detective told Coffelt, "[w]e're gonna have a ten-minute conversation[,] and you'll walk out the door, no matter what you tell us." *See id.* The detective also said, "[w]e're walking out this door today. Nothing's gonna happen to you today." *See id*. And, indeed, the detectives left and Coffelt was not arrested that day. *See id.* at 6.

During the conversation, Coffelt admitted that that he had had sexual contact with a minor victim and had used his cell phone to take photos of her. *See id.* at 4. When Coffelt got up and walked toward his bedroom to retrieve the phone, one of the detectives followed him to ensure he was not getting anything dangerous. *See id.* at 4-5.

While Coffelt was in his bedroom, the doorbell rang, and one of the detectives answered it. *See id.* The detective initially told the visitor that Coffelt was unavailable.

3

*See id.* at 12.  But upon learning that the visitor was a family court process server, the officer allowed the server to come in and hand Coffelt an order of protection.  *See id.* at 5, 12.

After the process server left, Coffelt gave the detectives permission to search his phone and provided the password.  *See id.* at 5.  Coffelt later admitted to using sex toys with the victim.  *See id.*  Accompanied by the detectives, he retrieved those toys from his room and turned them over.  *See id.* at 5-6.  And at the end of the conversation, Coffelt signed a consent form allowing the officers to search his apartment.  *See id.*

Coffelt first argued to Judge Roemer that this was a custodial interrogation and that a *Miranda* warning therefore was required.  Docket Item 65 at 3-10.  He also argued that even if the interview was not custodial, his admissions were not voluntary because of several mental health issues.  *Id.* at 10-12.  Judge Roemer rejected both arguments.  *See* Docket Item 73 at 8-16.  And this Court agrees with Judge Roemer.

**A.  Custody**

"The test for custody is an objective one: 'whether a reasonable person in [the] defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'"  *United States v. Newton*, 369 F.3d 659, 671 (2004) (quoting *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995)).  The Second Circuit has held that "[a]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."  *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (quoting *Newton*, 369 F.3d at 675); *see United States v. Faux*, 828 F.3d 130, 135-36 (2d. Cir. 2016) (collecting cases).  In fact, courts have repeatedly held that without some extraordinary facts establishing that the

defendant was in custody, home interrogations are not custodial.  See *United States v. Vado*, 87 F. Supp. 3d 472, 479 (S.D.N.Y. 2015) (noting that home interrogations are custodial "[o]nly in extreme or unusual circumstances").

For instance, in *Familetti*, the defendant, Charles Familetti, moved to suppress statements that he had made during a search of his apartment.  878 F.3d at 56.  Familetti was handcuffed when the search began, but he "was not restrained when . . . two agents sat with him in his bedroom to discuss cooperation; the agents' weapons were never drawn; and the pre-*Miranda* interview lasted at most several minutes."  *Id.* at 61.  The Second Circuit found that Familetti had not been subject to custodial interrogation during the interview.  *Id.* at 62.

Along the same lines, in *Faux*, the Second Circuit concluded that a defendant who was interviewed in her home during a search had not been "in custody" even though "about a dozen" agents were in her home at the time; she "was physically separated from her husband"; she "was not permitted to move freely about her home"; and she "never [was] told that she was free to leave or that she had a choice whether to respond to questioning."  *See* 828 F.3d at 136-39.  And based on *Faux*, this Court previously found that a defendant who felt sick during questioning and was accompanied by two agents into the bathroom was not "in custody."  *See United States v. Hildreth*, 2024 WL 2176944, at *7 (W.D.N.Y. May 15, 2024).  Conversely, in *Newton*, the Second Circuit found that an interrogation in the defendant's home was nonetheless custodial because he was handcuffed while he was questioned.  369 F.3d at 675-77.

This case is more like *Familetti*, *Faux*, and *Hildreth* than *Newton.*  The officers did not handcuff Coffelt, nor did they restrict his movement in any significant way.  Indeed,

5

the facts here are far less extreme than in *Faux* where "10 to 15 agents" were in the defendant's home for a "two-hour interrogation."  *See* 828 F.3d at 137.

It is true, as Coffelt observes, that the officers did not allow him to go from room to room unaccompanied.  *See* Docket Item 76 at 7.  But the defendant in *Faux* likewise "was not permitted to move freely about her home during the . . . interrogation"; in fact, "agents accompanied her to the bathroom and to her bedroom to fetch a sweater."  828 F.3d at 137.  The Second Circuit concluded that "[a]lthough she was not permitted to go from room to room without being accompanied, she was not 'completely at the mercy of the police.'"  *Id.* (quoting *Newton*, 369 F.3d at 675).  "A reasonable person would understand that being accompanied in one's home by agents who are legally present to execute a search warrant is a sensible precaution," the Second Circuit explained, "and that (absent other hallmarks of custody) freedom of action is not being curtailed 'to a degree associated with formal arrest.'"  *Id.* (quoting *Newton*, 369 F.3d at 672).  So, too, here.

Coffelt also says that the fact that one officer answered the door and initially told the process server that Coffelt was unavailable demonstrates that "[t]here was no way the [d]etectives were letting [him] out of that apartment."  *See* Docket Item 76 at 7.  As an initial matter, once the process server told the officer that he had to deliver court papers to Coffelt, the officer let him in to do so.  *See* Docket Item 73 at 12.  In fact, one officer "testified that they would not have let the process server in had [Coffelt] been in custody."  *See id.* at 6-7.

What is more, the officers explicitly told Coffelt when the interview began that he would "walk out the door, no matter what [he told them]."  *See id.* at 4; *cf. Faux*, 828

6

F.3d at 138 (finding no custody despite fact that defendant was "never told that she was free to leave"). And the officers left without arresting Coffelt that day, as promised. *See* Docket Item 73 at 6. All that belies Coffelt's suggestion that by answering the door, the officers showed Coffelt that he was not free to leave.

In sum, as the Second Circuit has found more than once, *see Familetti*, 878 F.3d at 60-62; *Faux*, 828 F.3d at 135-39, establishing that a defendant is "in custody" in his home requires clearing a high hurdle. This Court agrees with Judge Roemer that the facts here fall short.

### B.     Voluntariness

Coffelt next contends that even if he was not in custody, his statements still should be suppressed because they were not voluntary. Docket Item 76 at 11-12. To determine voluntariness, this Court must decide whether Coffelt's "will was overborne by the [detectives'] conduct." *See United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). In reaching that decision, the factors the Court must consider include (1) the characteristics of the defendant; (2) the conditions of the interrogation; and (3) the detectives' conduct. *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003).

Judge Roemer found that "[d]espite [Coffelt's] known mental conditions"—including ADHD, adjustment disorder, anxiety, and depression—"the recorded interview clearly shows that [Coffelt] understood what was occurring and that he was capable of rational choice." Docket Item 73 at 15. This Court agrees. As Judge Roemer noted, Coffelt appears on the recording "to be an adult of average intelligence who was able to converse with the detectives in a reasonable and logical manner," and "[a]t no time did

7

[Coffelt] indicate through his words or actions that he did not understand what was happening." *Id.*; *see generally* Gov. Ex. 2.

While an important factor, "a defendant's mental condition, by itself and apart from its relation to official coercion" does not "dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986) (explaining that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry"). Thus, a defendant's "diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (quoting *United States v. Chrismon*, 965 F.2d 1465, 1469 (7th Cir. 1992)). "In other words, the police must somehow overreach by exploiting a weakness or condition known to exist." *United States v. Parker*, 116 F. Supp. 3d 159, 174 (W.D.N.Y. 2015) (quoting *United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994)).

Here, as Judge Roemer found, the officers did not use any coercive tactics. *See* Docket Item 73 at 15. They asked permission to speak with Coffelt at the outset of the interview, did not threaten him or make any promises, and asked questions in a calm and conversational way throughout the interview. *See generally* Gov. Ex. 2. Nor is there any indication that Coffelt's mental health issues prevented him from having the rational choice to decline to talk with the officers. On the contrary, he sounded alert and coherent throughout the interview. *See generally id.* This Court appreciates the concern about Coffelt's mental health conditions, but there is simply no basis in the record for the Court to find that those conditions rendered his statements non-voluntary.

8

*Cf. Parker*, 116 F. Supp. 3d at 174 (finding statements voluntary because although defendant "had taken medication during the interview and suffered an apparent hallucination during the interview, he nonetheless appeared to understand and appropriately respond to [officer]'s questions").

It is true, as Coffelt observes, that the officers downplayed their concerns about Coffelt's sexual contact with the minor victim. *See* Docket Item 76 at 8. For example, the detectives referred to a New York State order of protection as "just a piece of paper" that they were "not worried about," and they likewise said that they were "not concerned about" the minor's being at Coffelt's apartment in violation of the order of protection. *See id.* at 8 (citing Gov. Ex. 2 at 2:45, 2:49). They also referred to sexual contact between Coffelt and the minor as "consensual" if he "didn't force her to do anything." *See id.* (citing Gov. Ex. 2 at 21:40, 22:50, 23:20). But—even crediting Coffelt's argument that the officers' conduct was misleading—that conduct falls far short of the standard required to render a statement involuntary based on trickery or deception. *See United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) (holding that claim of trickery or deception requires defendant to "produce clear and convincing evidence that the . . . agents affirmatively misled [him] as to the true nature of [their] investigation" (citation omitted)); *see also United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) ("[A] finding that police conduct is 'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary"; a court also must find "that under the totality of the circumstances . . . the defendant's will was overborne by the [police] conduct." (quoting *Anderson*, 929 F.2d at 99)).

9

Although the officers downplayed the seriousness of the conduct, they did not affirmatively make any promises of leniency or "misrepresentations" that might have "materially induced [Coffelt] to make incriminating statements"; instead, it appears that Coffelt spoke with the officers as a result of his "desire to cooperate, or from [his] ignorance of, or inattention to, his right to remain silent." *See Mitchell*, 966 F.2d at 100; *see also Haak*, 884 F.3d at 410 (explaining that "court[s] will not . . . readily imply an improper promise or misrepresentation from vague or ambiguous statements by law enforcement officers").

Indeed, the officers' statements here were far less misleading than those the Second Circuit found not to tip the balance in *Haak*. *See* 884 F.3d at 409-16. Here, the officers did not say that they were not looking to prosecute Coffelt if he cooperated; in fact, they told him repeatedly that his interaction with the minor victim was "wrong," *see* Gov. Ex. 2 at 19:10, 19:35, and that anyone in society learning about it would think "this is bad," *id.* at 20:58. In *Haak,* on the other hand, the Second Circuit found the defendant's confession to be voluntary despite the officers' telling the defendant "I'm not looking to come after you, but you gotta get on board or you, you shut your mouth and then the weight of the federal government is gonna come down on you." *See* 884 F.3d at 412-16.

For all those reasons, the Court again with Judge Roemer and declines to suppress the July 2022 statements.[4]

---

[4] In his reply in support of his objection, Coffelt also argues that the physical evidence obtained (the phone and the sex toys) should be suppressed. *See* Docket Item 79 at 1 ("The warrantless seizure of the physical items from . . . Coffelt's apartment on July 29, 2022, occurred during the interrogation he is seeking to suppress."). The government says that Coffelt waived this argument by not raising it before Judge

## II.   AUGUST CUSTODIAL INTERROGATION

On August 11, 2022, law enforcement interviewed Coffelt following his arrest. *See* Docket Item 73 at 16.  An officer quickly read Coffelt his *Miranda* warnings from an advice-of-rights card*,* but the officer never asked Coffelt whether he understood those rights and agreed to waive them.  *See id.* at 16-17.  As noted above, there is a video recording of the interview*,* Docket Item 38, Ex. B, but the parties dispute whether that recording demonstrates that Coffelt understood and voluntarily waived his rights.[5]

"If the [government] establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights."  *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).  "The prosecution must make the additional showing that the accused understood these rights."  *Id.*  That said, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  *Id.*

Judge Roemer found that Coffelt's statement were voluntary.  *See* Docket Item 73 at 18.  More specifically, Judge Roemer noted that "[a]fter receiving the *Miranda* warning, [Coffelt] was responsive to questions and engaged in extensive dialogue with law enforcement."  *Id.*  Coffelt "appeared alert, focused, and intelligent," Judge Roemer

---

Roemer.  *See* Docket Item 80.  Because the Court finds that the statements should not be suppressed, it need not and does not reach the question of whether the physical evidence should also have been suppressed as fruit of the poisonous tree or whether Coffelt properly preserved that argument.

[5] Coffelt also argues that the officer read his rights too quickly.  But as Judge Roemer found, there is no authority suggesting that quickly reading *Miranda* warnings poses a problem.  *See* Docket Item 73 at 18.

11

said, and "[a]t no time did [Coffelt] state that he wanted the interrogation to end, that he wished to remain silent, or that he wanted to speak with an attorney." *Id.* "Such conduct," Judge Roemer concluded, "constitutes an implied waiver." *Id.*

Coffelt counters that there is no evidence that he understood his rights, a fact that the government has the burden to establish. *See* Docket Item 76 at 12-14. "There must be something more than merely acquiescing with the interrogation to find that a suspect understood his *Miranda* rights and validly waived them," Coffelt argues. *Id.* at 14.

The law is clear that it is the government's burden to demonstrate that a defendant understood and knowingly waived his or her rights. *See Tague v. Louisiana*, 444 U.S. 469, 470 (1980) (explaining that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" (quoting *Escobedo v. Illinois*, 378 U.S. 478, 490 n.14 (1964))). And there is no presumption that the defendant understood his or her rights. *See id.* at 471. So the question is whether the video evidence submitted by the government is sufficient to meet its burden. And while the question is a close one, this Court agrees with Judge Roemer that it is.

The government relies on *Berghuis*, in which the Supreme Court found that a defendant had impliedly waived his *Miranda* rights. *See* 560 U.S. at 385-87. There, the Court found that

> [t]here was more than enough evidence in the record to conclude that [the defendant] understood his *Miranda* rights. [He] received a written copy of the *Miranda* warnings; Detective Helgert determined that [the defendant] could read and understand English; and [the defendant] was given time to read the warnings. [The defendant], furthermore, read aloud the fifth warning, which stated that "you have the right to decide at any time before

12

>  or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned."

*Id.* at 385-86.  As Coffelt observes, however, the defendant in *Berghuis,* unlike Coffelt, was given his rights to read, and the officers verified that he could read and understand English.  *See* Docket Item 76 at 14.  What is more, in *Berghuis*, unlike here, "there [wa]s no contention that [the defendant] did not understand his rights."  *See* 560 U.S. at 385.

That being said, the parties have not identified—nor has this Court found—any case in which a *Miranda* warning was deemed ineffective simply because of the failure to explicitly confirm the defendant's understanding of the rights about which he was told.  And the government has produced a video that shows Coffelt alert during the *Miranda* warning, responsive afterward, and intelligent throughout.

This Court has reviewed the relevant case law as well as the video footage of the interview, and after careful consideration, agrees with Judge Roemer that the video evidence meets the government's burden of showing an implied waiver.  Although Coffelt was not asked whether, and did not explicitly say that, he understood his rights, he also appears—as Judge Roemer observed—"alert, focused, and intelligent."  *See* Docket Item 73 at 18.  There is no reason to believe that Coffelt did not understand the rights as read to him.  And while there is no dispute that Coffelt has some mental health issues, there is no indication that any of those issues interfere with his basic understanding of language or concepts or that they rendered him unable to appreciate his right to remain silent.

Ultimately, although Coffelt's custodial interrogation presents a closer question, for the reasons explained above, this Court adopts Judge Roemer's recommendation to deny the motion to suppress the August 2022 statements as well.

13

**CONCLUSION**

For the reasons stated above, this Court accepts and adopts Judge Roemer's R&R, Docket Item 73, and Coffelt's motion to suppress, Docket Item 38, is DENIED. The parties shall contact the Court to schedule a status conference to set a trial date.

SO ORDERED.

Dated:    December 31, 2025
         Buffalo, New York


                                           /s/ Lawrence J. Vilardo
                                           LAWRENCE J. VILARDO
                                           UNITED STATES DISTRICT JUDGE