**DOCKET: 23-CR-55**

---

# United States District Court
# for the
# Western District of New York

**HON. LAWRENCE J. VILARDO, PRESIDING**

---

**UNITED STATES OF AMERICA**

**VS.**

**DUSTIN COFFELT**

---

**SENTENCING MEMORANDUM & CHARACTER LETTERS**

---

Dated: September 18, 2026
Submitted by:

CONNOR C. DOUGHERTY, ESQ.
Texido Law
69 Delaware Avenue, Suite 1100
Buffalo, New York 14202
(716) 306-5251
connor@texidolawwny.com
*Attorney for Dustin Coffelt*

TO: HONORABLE LAWRENCE J. VILARDO
U.S. DISTRICT JUDGE

MAEVE HUGGINS, ESQ.
ASSISTANT U.S. ATTORNEY

LISA FERRARO
U.S. PROBATION OFFICER

# PRELMINARY STATEMENT

Dustin Coffelt stands before the Court having pleaded guilty to all three counts of the Indictment: two counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e), and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). Dkt. No. 117. Mr. Coffelt does not minimize what he did. He sexually abused his former girlfriend's daughter and photographed that abuse. He accepts full responsibility for that conduct and for the lasting harm it has caused.

The Presentence Investigation Report ("PSR") calculates Mr. Coffelt's sentencing range to be 360 to 840 months. PSR at 15; Dkt. No. 126. That range is not a measured judgment of Mr. Coffelt. It places a thirty-seven-year-old man with no criminal history, who possessed few images of a single victim and distributed nothing, in the same range as the most dangerous repeat predators in the federal system.

The Court is not bound by that range. Counts One and Two each carry a fifteen-year mandatory minimum, and those minimums may run concurrently. Mr. Coffelt respectfully requests a sentence of 180 months' imprisonment, to be followed by a term of supervised release with conditions tailored to his rehabilitation and the protection of the community. That sentence is severe – fifteen years in federal prison, lifetime sex-offender registration, and the collateral consequences of these convictions are punishment enough to reflect the seriousness of the offense, deter others, and protect the public. A sentence "sufficient, but not greater than necessary" is a sentence to the mandatory minimum.

## PROCEDURAL HISTORY/OBJECTIONS TO PSR

Mr. Coffelt was arrested on August 11, 2022, and has remained in federal custody since his initial appearance. On April 15, 2026, he appeared before this Court and pleaded guilty to all three counts of the Indictment, without the benefit of a plea agreement. By the scheduled sentencing date of October 2, 2026, Mr. Coffelt will have served approximately 49 months in pretrial detention.

The Probation Office calculated the advisory range using the 2025 Guidelines Manual. PSR at 10. For the production counts, it applied a base offense level of 32 under USSG § 2G2.1(a), with two-level increases for the victim's age (§ 2G2.1(b)(1)(B)), the commission of a sexual act (§ 2G2.1(b)(2)(A) (Count Two only), and the use of a computer (§ 2G2.1(b)(6)(B)(i)). *Id.* at 10, 11. For the possession count, it applied a base level of 18 under § 2G2.2(a)(1), a five-level pattern-of-abuse increase (§ 2G2.2(b)(5)), a two-level computer increase (§ 2G2.2(b)(6)), and a two-level increase for the number of images (§ 2G2.2(b)(7)(A)). *Id.* at 12. After grouping, enhancements, and reductions, the PSR arrives at a total offense level of 42. With a criminal history category of I, the advisory range is 360 months to life, restricted by the statutory maxima of 360 to 840 months. *Id.* at 13-15.

Mr. Coffelt objects to the three two-level "use of a computer" enhancements applied at paragraphs 42, 52, and 59 of the PSR, which together should reduce the total offense level from 42 to 40. Objections to PSR at 1. These enhancements apply in virtually every child-pornography case and lack empirical support, so they do little to distinguish more culpable offenders from less culpable ones. The Court should sustain that objection. Ultimately, however, the precise Guidelines figure is not dispositive. Whether the total offense level is 42 or 40, the range remains advisory, and the § 3553(a) analysis that follows warrants a sentence well below it.

# BACKGROUND

For this Court to understand why we believe a sentence to 180 months is sufficient, it must understand who Dustin Coffelt is and the issues that preceded his behavior that brought him before this court. Mr. Coffelt's history shows that he is a socially isolated, mentally ill, first-time offender — not a hardened predator.

## *A. Mr. Coffelt's Isolation and His Issues with Mental Health Started At a Young Age*

Dustin Coffelt was born in Buffalo, New York to Dana and Lynn Coffelt on August 17, 1989. He was raised primarily by his mother after his parents divorced when he was only eleven years old. That is when the seeds of isolation began to take root in Mr. Coffelt's life. At eleven years old, he was old enough to understand that his family was being torn apart, but he had yet to develop the tools to process that heartbreak in a healthy way. He dealt with his parents' divorce by escaping into videogames and the internet, suppressing his negative thoughts and emotions instead of addressing them. Neither of Mr. Coffelt's parents recognized how detrimental that behavior was. Mr. Coffelt's father was a blue-collar type working for the Water Authority, who never took the time to see beyond the superficial aspects of his behavior. Unfortunately, we are unable to glean any insights from Mr. Coffelt's mother due to her passing away in 2020 from complications with COVID-19. But it does appear that her response to Mr. Coffelt's isolation perpetuated his problems instead of addressing them.

After her divorce, Lynn Coffelt poured all her time and affection into Dustin. She never remarried. She never had any more children. She relied on social services and alimony instead of working. It appears Dustin Coffelt was her crutch and that she needed him just as much as he needed her. She did everything for him and likely stunted him in the process as is evidenced by

his struggles from an early age with attention-deficit hyperactivity disorder, isolation, and a preoccupation with video games and the internet that his father recognized as a serious problem. PSR at 18-19; Dana Coffelt's Character Letter. Neither of his parents addressed any of his issues, and by the time someone did those seeds had already rooted themselves deep into Mr. Coffelt's psyche.

When he entered his freshman year at Lancaster High School in 2003, the staff immediately recognized the need for intervention, and Mr. Coffelt was placed on a 504-accommodation plan. After three years of being on the accommodation plan, he was retested, revealing a full-scale IQ that was 15 points lower than his initial testing in 2003. Mr. Coffelt was elevated to an individualized education program ("IEP"); which he remained on until he graduated in 2007. Neuropsychology Report at 1. He did not excel academically. He never played any sports. He wasn't a part of any groups or clubs. He accomplished very little during his time at Lancaster High School, but he was introduced to something that would impact his life substantially – opiates.

*B. Dustin Coffelt's Addiction Further Exacerbated His Loneliness and Isolation, Which In Turn Contributed to Him Living In a State of Arrested Development*

Mr. Coffelt attended Lancaster High School, which has been colloquially, and crassly, known as "Heroin High." He was first introduced to Lortab, which eventually led to more debilitating narcotics such as Opana and OxyContin. While these substances may have provided Mr. Coffelt with a rush of dopamine that allowed him to escape his reality for a short time, they also undoubtedly contributed to his isolation and loneliness. His addiction would plague him for years to come. Other children were learning to navigate the world around them, Mr. Coffelt was shutting himself off. While this doesn't excuse any of his conduct in this case, it does provide

some context as to why Mr. Coffelt had such a significant reaction to the affection that he was shown, regardless of its source.

When Mr. Coffelt graduated in 2007, he took out a loan to help him pay for community college. But he stopped attending after only a few weeks. Instead, he used the money to feed his addiction. Over the next few years, Mr. Coffelt bounced from minimum wage job to minimum wage job and lived with his mother, who continued to do everything for him. He worked at various pizzerias and fast-food restaurants. He rarely maintained employment for more than a few months. The only employment he maintained for more than a brief period was his job at Wal-Mart for approximately one year, where he worked nights stocking shelves in the dairy department and didn't interact with other employees or customers.

Years went by and Mr. Coffelt's primary focus was never far from his addiction. He lived with his mother, who continued to support him despite being aware of his issue. Very little had changed in Mr. Coffelt's life since he was eleven. He spent most of his time shut in his room playing videogames for hours upon hours, and he had very little social interaction with anyone outside of his mother. Which clearly took a toll on him. In 2009, he was hospitalized after vocalizing suicidal ideations, which he denied at the time. Despite the plethora of signs that he was spiraling, this cycle continued for four more years, likely due to his mother's enablement, before Mr. Coffelt sought any type of help.

### *C. Over a Decade Ago, Mr. Coffelt Put His Addiction Behind Him, Demonstrating an Ability to Follow the Rules and Established Guidelines*

In 2013, after spending the better part of a decade battling his addiction, Mr. Coffelt decided that enough was enough. He sought treatment at Preston Healthcare, and he remained under the care of Dr. Adebukola Abiola for nearly the next decade. PSR at 20; Neuropsychology

Report at 3. It has been almost fourteen years since he last used opiates. Mr. Coffelt's willingness to sustain long-term treatment demonstrates a capacity for compliance and rehabilitation that a lengthy sentence would serve no purpose in testing. While the choice to seek help and to continue to be successful demonstrates an ability to abide by established rules, his substance use disorder was only a manifestation of his underlying problems, a symptom of the more deep-seeded issues that have been with Mr. Coffelt for his entire life. And those issues continued throughout the relationship that he had with Beverly Spaich, the mother of the girl Mr. Coffelt was involved with.

*D. Mr. Coffelt's Issues with Isolation Continued During the Relationship Between Himself and Beverly Spaich, Preceding the Conduct in Question Before this Court*

Dustin Coffelt and Beverly Spaich met one another in 2012. Ms. Spaich had two children from a previous relationship. Shortly after the pair met, Ms. Spaich became pregnant with Mr. Coffelt's child. Mr. Coffelt moved into Ms. Spaich's apartment after he discovered that he had impregnated her, which she shared with her children.

Mr. Coffelt and Ms. Spaich may have been trying to do the right thing for their future daughter by making a home together, but the two simply weren't compatible. Less than two years into their relationship, their intimacy ceased. Neuropsychology Report at 6. Ms. Spaich became more of a maternal figure rather than a partner. *Id.* The two continued in that fashion for years, and Mr. Coffelt reverted to escaping from any negative thoughts or emotions by distracting himself with video games and online gambling. *Id.* at 5, 6. He didn't work. He didn't have any productive hobbies. He may have been an adult, but his behavior was barely any different than it was when he was eleven years old.

After approximately six years without any intimacy or significant emotional connection beyond his own daughter, the inappropriate relationship between himself and Ms. Spaich's daughter began to form. The two shared the same interests and hobbies, which speaks to Mr. Coffelt's state of arrested development. They would watch anime and play videogames together. Eventually, that relationship crossed the line and became sexual. In his interview with Dr. Benedict, Mr. Coffelt stated that their relationship was "like dating, consensual." *Id.* at 3.

In 2022, Ms. Spaich discovered the relationship and kicked Mr. Coffelt out of the apartment. Without any savings, income, or employment prospects; Mr. Coffelt had to rely on his father for support. Dana Coffelt rented an apartment for him to stay in. Ms. Spaich's daughter and Mr. Coffelt continued to communicate and meet. The evidence shows that Mr. Coffelt professed his suicidal ideations to her. *Id.* at 4. He stated that he was "having bad thoughts" and that he didn't "want to be here" if she wasn't in his future. Dr. Benedict stated these communications revealed "marked dependency needs and attention seeking behavior." *Id.* at 4. During those encounters, Mr. Coffelt took sexually explicit photographs of her; two of which are the subject of the charges that Mr. Coffelt pleaded guilty to.

*E. Serious and Documented Mental Illness*

Mr. Coffelt's conduct cannot be understood apart from his significant, documented psychopathology. A neuropsychological evaluation by Ralph H.B. Benedict, Ph.D., diagnosed adjustment disorder with anxious and depressed mood, avoidant personality disorder, ADHD, and substance use disorder. Neuropsychology Report at 11. On the Personality Assessment Inventory, his Phobia scale score was more than four standard deviations above the mean, reflecting severe social and agoraphobic avoidance, and his Depression–Cognitive score reflected a "very severely deficient" self-image. *Id.* Dr. Benedict found Mr. Coffelt to be "a

socially isolated individual who has few interpersonal relationships that could be described as close and warm," prone to "satisfying [his] dependency and intimacy needs via atypical or aberrant means," and observed that he related to the victim "as if it were a same-age peer, intimate relationship." *Id.* The evaluation also documents recurrent suicidal ideation. *Id.* None of this excuses Mr. Coffelt's conduct, but it explains how a man with no history of predatory behavior came to commit this offense, and it bears directly on his amenability to treatment and his low risk of reoffending.

*F. Acceptance of Responsibility and Cooperation*

Mr. Coffelt accepted responsibility from the outset. When law enforcement came to his home, he admitted his conduct, consented to the seizure and search of his cellphone, and voluntarily produced the physical evidence. PSR at 7-8. He waived his Miranda rights and gave a full statement, and he later admitted the facts of all three counts. *Id.* at 9-10. He then pleaded guilty to the entire Indictment without a plea agreement, sparing the victim the trauma of testifying at trial. *Id.* at 4. The Probation Office awarded him the full three-level reduction for acceptance of responsibility. *Id.* at 13-14.

## **LAW AND DISCUSSION**

*A. A Sentence at the Fifteen-Year Mandatory Minimum is Lawful and Sufficient*

The Court may lawfully impose a total sentence of 180 months. Counts One and Two each carry a fifteen-year mandatory minimum, and those minimums may run concurrent to one another. A recent decision in this Circuit confirms the mechanics: although the Guidelines are advisory and the statutory minimums are not, "the lowest possible sentence" equals the mandatory minimum "because the Court has discretion to run the minimum sentences . . .

concurrently." *United States v. Rankin*, 2025 WL 1456498, 10 (E.D.N.Y. May 21, 2025). The Guideline instruction to stack sentences consecutively to reach "total punishment," USSG § 5G1.2(d), is itself advisory, not mandatory. The Second Circuit has long recognized that a sentencing court retains "discretion to depart downward to sentence concurrently where the guidelines call for consecutive sentencing." *United States v. Rahman*, 189 F.3d 88, 157 (2d Cir. 1999). The mandatory minimum sets the bottom of the Court's discretion. Mr. Coffelt does not ask the Court to sentence him under fifteen years. He asks the Court to sentence him to that floor – a sentence that, with the roughly 49 months he has already served, still requires more than a decade of additional imprisonment.

*B. The Child-Pornography Guidelines Do Not Accurately Reflect the Sentencing Principles the Court Should Consider*

The Court "may not presume that a Guidelines sentence is reasonable" and must "conduct its own independent review of the § 3553(a) sentencing factors," bearing in mind the directive to impose a sentence "sufficient, but not greater than necessary." *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010). That review carries special force here, because the child-pornography Guideline is not an ordinary Guideline. In *Dorvee*, the Second Circuit held that § 2G2.2 "is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires," because the Commission did not develop it through its usual empirical, past-practice approach but instead amended it repeatedly "at the direction of Congress," often over the Commission's own objection. *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). The result is a Guideline whose enhancements "apply in nearly all cases" and are "all but inherent to the crime of conviction," so that "[a]n ordinary first-time offender is therefore likely to qualify for a sentence . . . rapidly approaching the statutory maximum," producing "virtually no distinction between the sentences

for defendants like Dorvee, and the sentences for the most dangerous offenders." *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). The court held that "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines," and encouraged district judges "to take seriously the broad discretion they possess," which "can range from non-custodial sentences to the statutory maximum." *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). Even the Supreme Court has confirmed that approach when it upheld a variance to the fifteen-year mandatory minimum on precisely that reasoning. *Kimbrough v. United States*, 552 U.S. 85, (2007)

The Second Circuit reaffirmed these principles in *Jenkins*, noting that the Commission has since "effectively disavowed § 2G2.2," holding that "every Guidelines sentence is limited by § 3553(a)'s 'parsimony clause,'" which requires individualized consideration and generally reserves sentences at or near the statutory maximum for the "worst of the worst." *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017)

The Second Circuit has confined *Dorvee* and *Jenkins* to the "narrow" context of defendants who neither produced child pornography nor had contact with children and reiterated that production offenses "ordinarily warrant significantly harsher punishment than possession or even distribution offenses." *United States v. Muzio*, 966 F.3d 61 (2d Cir. 2020). Mr. Coffelt does not contend otherwise, and he does not argue that his advisory range is *per se* unreasonable. The point is narrower: the empirical critique of the child-pornography Guidelines, which the *Muzio* majority acknowledged, extends to the production Guideline, giving the Court ample basis to focus, as § 3553(a) demands, on the individual before it. *United States v. Muzio*, 966 F.3d 61 (2d Cir. 2020) Notably, in *Muzio*, the district court found the Guidelines range "greater than necessary to meet the goals of sentencing" and instead built its sentence on the statutory

mandatory minimums, weighing the defendant's mitigation – an approach the Second Circuit affirmed as within the court's discretion. *United States v. Muzio*, 966 F.3d 61 (2d Cir. 2020)

The offense-specific facts confirm that this case sits far from the "worst of the worst." Mr. Coffelt possessed a relatively low number of images, all depicting a single victim; he distributed nothing; and he possessed no images of any other minor. PSR at 8, 10. Those facts distinguish him sharply from the commercial distributors and serial producers for whom the upper reaches of the statutory range are reserved.

*C. The Need to Avoid Unwarranted Sentencing Disparities*

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." As the court in *Dorvee* explained, the mechanical application of the child-pornography Guidelines produces the opposite of that command. It collapses the distinction between run-of-the-mill offenders and the most dangerous predators, sentencing them alike near the statutory maximum. *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). The United States Sentencing Commission's own data on production offenses confirm that the advisory range in this case badly overstates the typical sentence.

First, the range is far above what production offenders receive. In fiscal year 2019, the average sentence for a child-pornography production offender under § 2G2.1 was 275 months, roughly 23 years, and more than three-quarters (78.0%) of those offenders were convicted under a statute carrying at least a fifteen-year mandatory minimum, just as Mr. Coffelt is. *Federal Sentencing of Child Pornography: Production Offenses* at 26. Mr. Coffelt's advisory range of 360 to 840 months begins well above that national average.

Second, a below-Guidelines sentence in a production case is the norm, not the exception. In fiscal year 2019, only 30.7% of § 2G2.1 offenders were sentenced within the guideline range, while a majority (57.2%) received a variance below it under 18 U.S.C. § 3553(a), including 36.1% who received a non-government-sponsored downward variance. *Id.* at 28. As the Commission explained, the average guideline minimum has climbed steadily (to 332 months by fiscal year 2019) while the average sentence imposed has held near 275 months because "courts continue to impose lengthy sentences, but also increasingly apply downward variances in response to the higher guideline ranges that apply to the typical child pornography production offender." *Id.*at 27. A downward variance here would place Mr. Coffelt with the majority of production defendants, not outside the mainstream.

Third, the offense-specific data positions Mr. Coffelt below the average production offender. The Commission found that where the youngest victim was a teenager, the average production sentence was 232 months - materially lower than other types of offenders. *Id.* at 52. Ms. Spaich's daughter was thirteen. PSR at 9. Any aggravating features are already fully reflected in Mr. Coffelt's offense-level computation, and the individualized mitigation set out above – his complete lack of criminal history, his documented low risk of recidivism, his serious mental illness, his full acceptance of responsibility, and the limited scope of the offense (fewer than thirty images of a single victim, with no distribution and no other victims) – justifies a sentence below even these averages. PSR at 8, 10, 14; Neuropsychology Report at 12.

Imposing a sentence of 360 months or more on this first-time, Category I offender would place Mr. Coffelt not merely at, but far above, the average sentences imposed on production offenders – including many whose conduct was graver. A sentence at the fifteen-year mandatory

minimum avoids that unwarranted disparity while still imposing one of the most serious sentences the federal system provides.

*D. Mr. Coffelt Presents a Low Risk of Recidivism and a Strong Need for Treatment*

Dr. Benedict expressly assessed Mr. Coffelt's "risk for recidivism [as] low," finding "no evidence that Mr. Coffelt has pedophilic urges outside of this relationship" and characterizing the offense, "however egregious," as "one of convenience, within the confines of his home." Neuropsychological Report at 12. That clinical assessment is consistent with the record.

Mr. Coffelt has no prior criminal history, no history of contact with any other minor, and no history of predatory conduct outside this single, aberrant relationship. PSR at 10, 14. The Second Circuit has cautioned that a finding of high risk to reoffend "must . . . [have] some support in the record," and has recognized that recidivism declines markedly with age – a Category I offender's risk falls substantially as he moves through his forties and fifties. *United States v. Jenkins*, 854 F.3d 181, 192 (2d Cir. 2017). A fifteen-year sentence will result in Mr. Coffelt being released in his fifties, at a demonstrably lower risk of reoffending, especially after he completes the sex-offense-specific and mental-health treatment the PSR recommends. PSR at 24, 25. A sentence of thirty years or more would add nothing to public safety that fifteen years, lifetime registration, and lifetime supervised release do not already secure.

Dr. Benedict's clinical judgment is strongly corroborated by research on sexual recidivism. The foundational meta-analysis in this field, examining 61 studies and nearly 29,000 offenders, found that the average sexual-offense recidivism rate is low – 13.4% over an average four-to-five-year follow-up – a finding the authors described as "contradicting the popular view that sexual offenders inevitably reoffend." *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies* at 1. More recent data continues to support that conclusion. Sexual

recidivism rates run 3% to 5% at five years and roughly 10% at twenty years, and for approximately half of registrants the risk is no greater than the general male population's lifetime rate of first-time sexual offending — below 2%. *How Public Registries Obscure Sexual Recidivism Risk: Evidence from State Administrative Data* at 3. The premise that a person who has committed a sexual offense presents a uniformly “high and enduring” risk is empirically unfounded. *How Public Registries Obscure Sexual Recidivism Risk: Evidence from State Administrative Data* at 3.

Two features of the literature bear directly on Mr. Coffelt. First, sexual-recidivism risk “declines with age” and “the longer individuals remain offence-free in the community.” After ten years without committing any additional offenses, most individuals pose no more risk than males in the general population. *Dr. Karl Hanson Expert Report* at 3. Second, the conditions that would elevate risk – established sexual deviance and prior sexual offending – are absent here, while the psychological characteristics Mr. Coffelt does present, such as distress, depression, and a negative self-image, have “little or no relationship” with sexual recidivism. *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies* at 10; Neuropsychology Report at 12.

The nature of Mr. Coffelt's offense also aligns with a lower-risk profile rather than a higher one. Mr. Coffelt was a live-in father figure to Ms. Spaich’s daughter, and he helped raise her before the offense. PSR at 19. The research shows that individuals who offend against a member of their own household are approximately half as likely to reoffend as those who offend against victims outside the family, and that this intrafamilial pattern “tends not to repeat.” Dr. Karl Hanson’s Testimony at State SORA Hearing, Tr. at 13-14. That empirical reality matches Dr. Benedict's assessment that the offense was “one of convenience, within the confines of his home,” with no evidence of deviant urges outside this single relationship. Neuropsychology

Report at 12. None of this diminishes the gravity of what Mr. Coffelt did. It bears only on the forward-looking questions § 3553(a)(2)(C) poses – the risk he will pose in the future and the incapacitation reasonably necessary to address it. It confirms that a fifteen-year sentence followed by lengthy supervised release is sufficient to protect the public.

*E. Restitution and Financial Penalties*

Restitution is mandatory in an amount no less than $3,000 per victim, but the victim in this case has not requested restitution. PSR at 9. Mr. Coffelt is prepared to satisfy any restitution the Court orders and does not contest the mandatory special assessments, subject to the Court's determination of his ability to pay. He respectfully requests that the Court decline to impose a discretionary fine, or impose one below the Guidelines range, in light of his limited financial circumstances and the substantial statutory assessments already required.

## **CONCLUSION**

For the foregoing reasons, Mr. Coffelt respectfully requests that the Court impose a sentence of 180 months imprisonment followed by a term of supervised release. Such a sentence would reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, and protect the public, while remaining "sufficient, but not greater than necessary" to comply with 18 U.S.C. § 3553(a). Counsel appreciates the Court's careful consideration of the points raised in this Memorandum and of the materials submitted on Mr. Coffelt's behalf.

Respectfully Submitted,

CONNOR C. DOUGHERTY
Texido Law
69 Delaware Ave, Suite 1100
Buffalo, New York 14202
716-306-5251
connor@texidolawwny.com
*Counsel for Mr. Coffelt*

# TABLE OF EXHIBITS

**Exhibit A** - Neuropsychology Consultation Report of Ralph H.B. Benedict, Ph.D. (June 25, 2023)

**Exhibit B** - Character letter of Dana Coffelt (Sept. 10, 2026)

**Exhibit C** - Character letter of Anne Coffelt (Sept. 9, 2026)

**Exhibit D** - R.K. Hanson & M.T. Bussière, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies*, 66 J. Consulting & Clinical Psych. 348 (1998)

**Exhibit E** - R.K. Hanson, G. Marquez Alcala & J.J. Prescott, *How Public Registries Obscure Sexual Recidivism Risk: Evidence from State Administrative Data*, Psych., Pub. Pol'y & L. (in press 2025)

**Exhibit F** – Dr. Karl Hanson Expert Report, filed in the Michigan Sex Offenders Registration Act class litigation, No. 2:22-cv-10209 (E.D. Mich. Oct. 2, 2023)

**Exhibit G** - Testimony of R. Karl Hanson, Ph.D. (Mass. Sex Offender Registry Bd. June 26, 2024)

**Exhibit H** - U.S. Sentencing Comm'n, *Federal Sentencing of Child Pornography: Production Offenses* (Oct. 2021)